**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT ASHLAND**

**CIVIL ACTION NO. 23-25-DLB-EBA**

**JUSTIN DAVIS** **PLAINTIFF**

**v.** **MEMORANDUM OPINION AND ORDER**

**JUDY MABRY, et al.** **DEFENDANTS**

* * * * * * * * * * * * * * * *

## I. INTRODUCTION

This matter is before the Court on the Motion for Summary Judgment from Defendants Southern Health Partners, Inc., Karen Bennett Baker, Latrisha Ferguson, Judy Mabry, and Norah McGlone (Doc. # 60). Plaintiff Justin Davis having filed his Response in Opposition (Doc. # 64)[1] and Defendants having filed their Reply (Doc. # 66), the matter is now ripe for the Court's review. For the following reasons, Defendants' Motion is **granted in part** and **denied in part**.

## II. FACTUAL AND PROCEDURAL BACKGROUND

This case stems from a self-inflicted hand injury sustained by Plaintiff Justin Davis on March 1, 2021. At all times relevant to this case, Davis was a resident of Ashland, Kentucky. (Doc. # 1 ¶ 3). On March 1, 2021, Davis suffered a gunshot wound to his left hand when he reached into a couch at an acquaintance's house and accidentally

[1] Davis filed two Responses with identical substantive arguments. (*See* Docs. # 63 and 64). However, in Docket Entry 64, Davis attached a series of exhibits that relate to his Response. (*See* Docs. # 64-1 through 64-25). For the sake of completeness of the record, the Court will refer to Docket Entry 64 as the operative Response in this Order.

discharged the firearm into his hand. (Doc. # 60-3 at 50:13–51:6). He was rushed to the hospital at the University of Kentucky ("UK") in Lexington, Kentucky, where Dr. Morgan Brgoch performed a four-hour emergency surgery on Davis's left hand to repair "a fracture and dislocation of several of the hand bones." (*Id*. at 52:13–53:12; Doc. # 60-4 at 30:17–23). In the first surgery, Dr. Brgoch reduced the swelling in Davis's hand and put the bones back in their regular place with several pins. (Doc. # 60-4 at 37:13–38:25). Two days later, Davis had a second, less intensive surgery on his hand. (*Id*. at 41:16–43:19).

Davis was discharged from the hospital on March 5, 2021. (Doc. # 60-3 at 57:11–16). He left with six pins in his hand to stabilize the bones and nerves after the surgeries. (Doc. # 60-4 at 53:3–22; Doc. # 64-10). He was given first-aid materials and instructions on how to keep his wound clean. (Doc. # 60-3 at 60:9–16). He was also given a follow-up appointment with Dr. Brgoch "roughly four weeks" after his discharge. (*Id*. at 57:11–19).

However, Davis did not attend the follow-up appointment, citing car troubles on his way to Lexington. (*Id*. at 58:10–59:22). He claims he rescheduled the appointment for a future date, but he did not attend the rescheduled appointment either. (*Id*.). Further, Davis said he did not have his wound checked by any other medical professional between his discharge from the UK hospital on March 5, 2021 and May 9, 2021. (*Id*. at 63:14–25). Dr. Brgoch testified that he did not see Davis again until 2022. (Doc. # 60-4 at 58:15–17).

Nearly eight weeks after being discharged from the hospital, Davis was arrested on May 9, 2021 pursuant to a bench warrant issued the night of his injury. (Doc. # 60-3 at 35:3–21, 66:14–18). Prior to being taken to the Boyd County Detention Center

("BCDC"), Davis was taken to King's Daughters Medical Center ("KDMC") in Ashland for medical clearance. (*Id*. at 69:23–70:6; *see also* Doc. # 64-12). He was shortly cleared for booking, although his attending doctor did note his "surgical hardware" in his left hand, as well as mild swelling. (Doc. # 64-12).

Davis was then taken to BCDC for booking. On his initial screening form dated May 10, 2021, BCDC staff reported that Davis was visibly suffering from pain in his hand from a gunshot wound. (Doc. # 64-17). Davis reported to staff that he "struggle[d] getting dressed, showered, undressed" due to his swollen hand. (*Id*.). While he was in the assessment cell, Davis "notic[ed] the pins and things hanging out of [his] hand[,]" which made him call for medical assistance. (Doc. # 60-3 at 93:18–94:8).

On May 11, 2021, Davis fell from the bunk in the assessment cell and further injured his hand. (*Id*. at 94:17–95:22). Several inmates in the assessment cell alerted deputies of Davis's injuries. (*Id*. at 99:2–16, 100:11–24). He was taken to the medical observation room, where jail staff noted he was unable to move his arm or wrist and he had dried blood near his pin sites. (Doc. # 64-17). Staff also noted he had an increased edema, but no changes in color to his hand. (*Id*.). Davis had an X-ray later that day. (Doc. # 60-3 at 103:2–23). By the time he had his X-ray, Davis had "worked out" all the pins that were previously in his hand. (*Id*.). Davis alleges that deputies claimed he had "self-mutilated" by taking the pins out of his hand, and he was placed on suicide watch that same day. (*Id*. at 100:11–24; Doc. # 60-5 at 21:18–22:10). In conjunction with his May 11 medical visits, BCDC staff notified APRN Karen Bennett-Baker, BCDC's medical director, that Davis would need an outside appointment, which she confirmed via text

message on or about May 12, 2021. (Doc. # 60-7 at 34:23–35:25; *see also* Doc. # 64-20).

Eleven days after his fall, Davis saw Bennett-Baker in person on May 22, 2021 for an examination. (*Id*. at 22:11–22). She observed discoloration of one of his fingers and inability to straighten his fingers, which she attributed to "some type of nerve injury." (*Id*. at 23:5–18). She further observed that Davis's left arm had experienced significant atrophy and was much smaller than his right arm. (*Id*. at 23:18–24:6). She further found that Davis's left middle finger was "turning a gray color" which Baker-Bennett concluded meant it had poor circulation. (*Id*. at 25:4–13). Davis told Baker-Bennett that he could not use his left hand "for any kind of task" including lifting, dressing himself, bathing himself, or anything involving fine motor coordination. (*Id*. at 25:11–18). Bennett-Baker testified that Davis told her he removed the pins from his hand because he was "angry that he was in jail" and "angry that he was hurting." (*Id*. at 24:18–25:3).

Baker-Bennett testified that her immediate concern, based on what Davis told her and his UK medical records, was that he had a brachial plexus injury in his left shoulder that was impacting his mobility. (*Id*. at 26:5–27:3). She expressed concern that Davis could become permanently disabled if he did not receive prompt treatment. (*Id*. at 34:10–35:17). Based on her findings, she prescribed Davis a muscle relaxant to help with his shoulder and hand pain. (*Id*. at 28:12–23). She further ordered that Davis should be placed in a low bunk, given an arm sling, and dressed in a two-piece uniform to help with his limitations. (Doc. # 64-21). Baker-Bennett also ordered that Davis be seen by a neurologist. (*Id*.; Doc. # 60-5 at 29:10–16). However, she did not follow up with Davis's hand surgeon, Dr. Brgoch, because "[Davis] had not kept his follow-up appointments" and

"a lot of the times when that happens, the [doctors] doing the surgery don't necessarily want to see them back." (Doc. # 60-5 at 30:1–12).

Two days after Davis's examination with Baker-Bennett, on May 24, 2021, BCDC staff attempted to schedule Davis a neurology appointment at KDMC. (*Id*. at 30:19–32:3). BCDC received notification from KDMC on June 2, 2021 that their earliest appointment date was August 31, 2021. (*Id*. at 32:4–18). Davis appeared at his appointment on August 31, but his neurologist did not. (*Id*.). His appointment was rescheduled for November 15, 2021, but when November 15 rolled around, BCDC staff forgot to take him to his rescheduled appointment. (*Id*. at 32:18–24). His appointment was rescheduled a second time for January 31, 2022. (*Id*. at 32:25–33:2). All the while, Davis made more than thirty "sick calls" to BCDC staff to complain about the pain in his hand. (*See generally* Doc. # 64-22). At his January 31, 2022 appointment, after a nerve conduction study, the neurologist confirmed that Davis had nerve damage in his left hand. (Doc. # 60-3 at 274:19–275:22). In the time he had been incarcerated, Davis testified that his middle finger had "turned black" from lack of circulation. (*Id*. at 276:3–278:1).

Davis was released from custody in March of 2022. (*Id*. at 286:2–18). After release, he went back to UK to see Dr. Brgoch for several surgeries. (*Id*.). The first two were capsulotomy releases to attempt to regain his hand and knuckle function. (*Id*. at 294:2–295:2). After the surgeries, Davis continued physical therapy on his hand, but to no avail. (*Id*.). Eventually, Davis had his left middle finger removed. (*Id*. at 295:3–13).

Davis filed his Complaint in this Court on March 8, 2023. (Doc. # 1). He alleged denial of medical treatment and inadequate medical care in violation of the Fourteenth Amendment (Count One); negligence and gross negligence (Count Two); policies and/or

customs of inadequate medical care and inadequate conditions of confinement in violation of the Supreme Court's holding in *Monell v. New York City Dept. of Soc. Servs*, 436 U.S. 658 (1978) (Count Three), and failure to adequately train officers in violation of 42 U.S.C. § 1983 (Count Four). (*Id.*). Defendants Karen Bennett-Baker, Latrisha Ferguson, Judy Mabry and Southern Health Partners, Inc. ("SHP") (collectively, "the SHP Defendants") filed their Answer (Doc. # 7) on May 16, 2023. Defendants C.J. Caudill, Gustavo Guzman, William Hensley, Donald Rucker and Darren Wilson (collectively, "the BCDC Defendants") filed their Answer (Doc. # 18) on June 26, 2023. Defendant Norah McGlone filed her Answer (Doc. # 20) on August 22, 2023.

The BCDC Defendants filed a Motion for Judgment on the Pleadings on February 27, 2024. (Doc. # 31). After fully briefing the Motion, the Court entered a Memorandum Opinion and Order on August 19, 2024 (Doc. # 39), granting the BCDC Defendants' Motion as to Counts One and Two and denying the Motion as to Count Three. Several months later, pursuant to a settlement and the parties' Proposed Agreed Order of Partial Dismissal (Doc. # 51), the Court dismissed the remaining claims against BCDC Defendants with prejudice.[2] (Doc. # 52).

After a lengthy discovery period, Defendants filed their Motion for Summary Judgment on September 29, 2025. (Doc. # 60). Davis having filed his Response in Opposition (Doc # 64) and the SHP Defendants having filed their Reply (Doc. # 66), the Motion is ripe for the Court's review.

---

[2] Since the BCDC Defendants have been dismissed, the Court will refer to the SHP Defendants as "Defendants" for the remainder of this Order.

## III. ANALYSIS

### A. Standard of Review

Federal Rule of Civil Procedure 56 allows for the granting of summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party or parties bear the burden of showing an absence of a genuine issue of material fact. *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). A genuine dispute as to a material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the Court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. at 586. At this stage, the Court must not weigh evidence or make credibility determinations but instead must ascertain "whether there is a genuine issue for trial." *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (quoting *Anderson*, 477 U.S. at 249). In making this determination, the Court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

### B. Deliberate Indifference Claim

Defendants first seek summary judgment on Count One of Davis's Complaint, where he alleges deliberate indifference to his medical needs by the SHP Defendants in violation of the Fourteenth Amendment. Deliberate indifference by prison officials to an inmate's serious medical needs constitutes "unnecessary and wanton infliction of pain" in violation of the Eighth Amendment. *Miller v. Calhoun Cnty.*, 408 F.3d 803, 812 (6th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "Pretrial detainee claims, though they sound in the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment, are analyzed under the same rubric as Eighth Amendment claims brought by prisoners." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013) (internal citations omitted). To establish deliberate indifference under the Fourteenth Amendment, a plaintiff must show (1) he or she suffered a sufficiently serious medical need; and (2) that each defendant "acted deliberately (not accidentally), [and] also recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Helphenstine v. Lewis Cnty., Ky.*, 60 F.4th 305, 317 (6th Cir. 2023) (quoting *Brawner v. Scott Cnty., Tenn.*, 14 F.4th 585, 596 (6th Cir. 2021)). A plaintiff must show more than just negligence in his or her medical care to establish deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Indeed, "care qualifies as 'cruel and unusual' only if it is 'so grossly incompetent' or so grossly 'inadequate' as to 'shock the conscience' or 'be intolerable to fundamental fairness.'" *Phillips v. Tangilag*, 14 F.4th 524, 535 (6th Cir. 2021) (quoting *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018)).

In this case, the analysis turns on the second component. Defendants concede that Davis's injury constituted a sufficiently serious medical need. (Doc. # 60 at 12). However, Defendants contend that Davis cannot show that any of the Defendants were deliberately indifferent toward his medical needs. Quite the opposite: each of the Defendants "took appropriate actions to address Davis' [sic] medical needs[.]" (*Id.*). They aver that Davis's lack of medical expert evidence of Defendants' malfeasance dooms his claim and that the undisputed facts establish that Davis received care for his injuries. (*Id.* at 13). They further claim that, since Davis received medical care, he is required to present expert testimony that shows how his care constituted deliberate indifference, and he did not. (*Id.* at 15). Accordingly, they claim they are entitled to summary judgment as a matter of law. (*Id.* at 17).

Davis disagrees. First, he claims that he is not required to provide expert testimony because his case is not an adequacy-of-care deliberate indifference case. (Doc. # 64 at 11–12). He claims that his case is one where Defendants have shown "an outright refusal to provide the only medically appropriate treatment despite repeated notice and an obvious serious need." (*Id.* at 13 (citing *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899–900 (6th Cir. 2004))). Second, Davis claims that Bennett-Baker's admissions that she did not reach out to Davis's hand surgeon because he failed to show up to previous appointments is a "non-medical reason" for denying his care that satisfies the subjective prong of the deliberate indifference analysis. (*Id.* at 14–15).

To start, Davis's contention that he did not receive medical care while at BCDC is farcical. Upon arriving at BCDC, Davis received an initial screening where he was assessed to have a serious hand injury. (Doc. # 64-17). After he fell from his bunk, he

received treatment at the medical unit where he received pain medication and underwent an X-ray. (*Id.*). Eleven days later, Davis had an appointment with Bennett-Baker, who physically examined him at BCDC. (Doc. # 64-21). Based on her examination, she made findings that Davis had a shoulder injury that needed examination by a neurologist, and she subsequently ordered that the examination be scheduled. (*Id.*). Following Davis's appointment, Bennett-Baker ordered a series of practical remedies for Davis's ailments, including a sling and more appropriate uniform. (*Id.*). BCDC staff took Davis to his August 31, 2021 neurology appointment and then to his rescheduled January 31, 2022 neurology appointment. (Doc. # 60-5. at 30:19–32:3, 32:25–33:2). All of that treatment, despite Davis's protestations, is medical care. And just because Davis disliked the care he received does not mean it was not recognizable medical care. *See Estelle*, 429 U.S. at 105–06.

Having determined that Davis did, in fact, receive medical care, the Court will move to Defendants' contentions that the medical care he received was adequate under the Fourteenth Amendment. "For [detainees] to prove grossly inadequate care . . . courts generally require them to introduce medical evidence, typically in the form of expert testimony." *Phillips*, 14 F.4th at 535. Courts require expert opinions to evaluate whether the care met society's evolving standards of decency, the guidepost for evaluating Eighth Amendment and Fourteenth Amendment deliberate indifference cases. *Id.* (citing *Estelle*, 429 U.S. at 106). Further, the Sixth Circuit has held that a failure to provide medical expert testimony proving a casual link between a detainee's injury and the allegedly inadequate treatment has the effect of dooming a constitutional deliberate indifference

claim. *King v. Alexander*, 574 F. App'x 603, 606 (6th Cir. 2014) (citing *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013)).

Defendants contend that Davis does not have medical expert testimony that establishes Defendants' deliberate indifference. (Doc. # 60 at 13). They argue that Davis's expert, Linda Bernard, did not testify that any of the Defendants' interactions with Davis caused his injuries. (*Id*.). They compare this case to *King*, where the Sixth Circuit held that the plaintiff's deliberate indifference claim failed because she did not put forth medical expert evidence to establish that prison officials caused her injury or delays in her treatment. (*Id*. at 15–16 (citing 574 F. App'x at 606)). They finish by arguing that Davis "failed to establish facts that would support a finding of deliberate indifferent on the part of [Defendants]," such that they are entitled to summary judgment. (*Id*. at 16–17).

Davis, for his part, primarily argues that he does not need to put forth expert testimony because the nature of his injuries was sufficient to establish his need for care. (Doc. # 64 at 12). And even if medical expert testimony were required in certain deliberate indifference cases, Davis claims his case is not one of them because he was entirely denied treatment. (*Id*. at 12–13). Finally, Davis argues that Karen Bennett-Baker's admission that she did not reach out to Dr. Brgoch to set up an appointment for Davis's hand itself constitutes deliberate indifference. (*Id*. at 14–15).

Upon review of the record evidence, the Court finds that Davis has failed to establish the kind of deliberately indifferent medical care and treatment that would entitle him to relief under the Fourteenth Amendment. As set forth *supra*, Davis received medical care from Bennett-Baker, which makes this case an adequacy-of-care case. And in the Sixth Circuit, medical expert evidence is typically needed to establish that an official's

behavior was the kind of conscience-shocking, grossly incompetent conduct that violates the Fourteenth Amendment. *Phillips*, 14 F.4th at 535. Here, Davis retained Linda Bernard, RN, as his medical expert. (*See* Doc. # 60-9). While Bernard did take umbrage with some of Bennett-Baker's treatment and care of Davis, she could not conclude that Bennett-Baker's or any of the Defendants' behavior caused Davis's injuries. (*Compare id.* at 94:10–96:11 *with* 80:16–24, 90:10–21, 96:13–19). The same can be said of Bernard's conclusions on Judy Mabry's treatment of Davis.[3] (*Compare id*. at 96:20–97:14 *with* 99:4–100:11).

Further, Dr. Brgoch testified that Davis's later surgeries were "necessitated by . . . denial of splinting, physical and/or occupational therapy and followup care with [Dr. Brgoch.]" (Doc. # 60-4 at 141:6–21, 148:3–15, 159:1–15, 161:15–20, 163:5–10). Again, the Court does not think this is the kind treatment that garners relief under the Constitution. To start, Dr. Brgoch based his testimony on the idea that Davis did not receive care, which this Court has determined to be false. (*Id*.). More notably, Dr. Brgoch did not say that the care Davis received at BCDC was grossly incompetent or conscience shocking. Rather, he focused more on how Defendants *should* have acted, which is more akin to negligence. (*Id*. at 163:5–19). Nowhere in his testimony does Dr. Brgoch explicitly or implicitly state that Defendants' treatment of Davis was so far afield from the medical standards that it constituted deliberate indifference.

Without some showing that Defendants' care exacerbated his condition, Davis's deliberate indifference claim cannot continue. *See Phillips*, 14 F.4th at 538–39 (denying deliberate indifference claim because plaintiff failed to show medical evidence that delay

[3] Bernard did not criticize the care provided by Latrisha Ferguson or Nora McGlone. (Doc. # 60-9 at 100:13–20).

in treatment worsened plaintiff's condition); *Graham ex rel. Estate of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) ("However, where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law.") (internal citations omitted). Accordingly, Defendants' Motion is **granted** as to Davis's deliberate indifference claim.

### C. Negligence and Gross Negligence Claim

Defendants next move for summary judgment on Davis's claim of negligence and gross negligence. A claim of negligence under Kentucky law requires a plaintiff to show (1) the defendant owed the plaintiff a duty of care; (2) a breach of that duty by the defendant; (3) causation that links defendant's breach to plaintiff's injuries; and (4) damages resulting from the breach. *Patton v. Bickford*, 529 S.W.3d 717, 729 (Ky. 2016) (citing *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88 (Ky. 2003)). "The element of duty is a question of law for the court to decide, breach and injury are questions of fact for the jury to decide, and causation is a mixed question of law and fact." *Simons v. Strong*, 978 F. Supp. 2d 779, 783 (E.D. Ky. 2013) (citing *Pathways, Inc.*, 113 S.W.3d at 89). What's more, Kentucky courts "generally require patients to introduce expert medical evidence to establish the breach and causation elements" of medical negligence claims. *Phillips*, 14 F.4th at 540 (collecting cases). "A crucial aspect of a Kentucky medical negligence case is the requirement that a plaintiff establish the standard of skill expected and the opinion that the alleged negligence proximately caused the injury." *Rowland v. Southern Health Partners, Inc.*, No. 3:18-CV-00033-GFVT-EBA, 2020 WL 4288401, at *6 (E.D. Ky. July 27, 2020) (internal citations omitted).

Further, gross negligence is defined by the Supreme Court of Kentucky as "a 'wanton or reckless disregard for the lives, safety, or property of others[.]'" *Jackson v. Mayfield KY OPCO, LLC*, 733 S.W.3d 345, 362 (Ky. 2025) (quoting *Gibson v. Fuel Transp., Inc.*, 410 S.W.3d 56, 59 (Ky. 2013)). "Moreover, '[e]ven where a single act of negligence might not constitute gross negligence, gross negligence may result from the several acts.'" *Id*. (quoting *Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382, 388 (Ky. 1985)). In determining what behavior constitutes wanton or reckless behavior, Kentucky courts look to whether "the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences[.]" *Id*. (quoting *Kirschner by Kirschner v. Louisville Gas & Elec. Co.*, 743 S.W.2d 840, 843 (Ky. 1988)).

Defendants primarily claim that Davis does not have the requisite expert proof to prove negligence or gross negligence. (Doc. # 60 at 17). Specifically, they argue that Davis's expert, Linda Bernard, did not testify to the causation element of negligence. (*Id*.). Further, they claim that Davis's other expert, Brgoch, explicitly stated he was not issuing an opinion on whether Defendants deviated from the standard of care.

Davis contends that this issues of causation and the detrimental effect of Defendants' conduct on him are "self-evident" under Sixth Circuit precedent. (Doc. # 64 at 13). He claims that his injury was visually apparent. (*Id*.). He avers that his expert, Dr. Brgoch, concluded that "lack of splinting, therapy, and follow-up caused permanent deformity and amputation." (*Id*.). He further argues that his injuries are "measurable,

permanent, and directly traceable to [Defendants'] decision to withhold follow-up care." (*Id*.).

Upon review of the record evidence, the Court finds that Defendants are not entitled to summary judgment on Plaintiff's claim of negligence. First, it is clear Defendants—nurses at BCDC—had a duty to take requisite care of Davis while he was incarcerated. Davis's expert, Linda Bernard, testified to the standard of care required for medical professionals in correctional facilities across the country, including in Kentucky. (Doc. # 60-9 at 71:9–72:25). As for breach, Bernard opined that Bennett-Baker and Mabry violated the standard of care in some respects. (*Id*. at 94:10–96:19, 96:20–98:1). Defendants challenge neither of Bernard's contentions, nor do they assert that Davis did not suffer damages. So, the Court will accept the duty, breach and damages elements as proven.

Further, the Court concludes that a jury could find that Defendants' actions and inaction caused Davis's injuries. To start, Bernard did not testify to the element of causation of Davis's injuries. (*Id*. at 80:16–24, 90:10–21, 96:13–19, 99:4–100:11). However, Dr. Brgoch testified that he believed Defendants' conduct—denying Davis a splint, physical and/or occupational therapy and follow-up care with Dr. Brgoch—caused Davis's injuries to be worse than they were when he was first incarcerated. (Doc. # 60-4 at 141:6–21, 148:3–15, 159:1–15, 161:15–20, 163:5–10). Defendants do not argue that Dr. Brgoch's conclusions are wrong, unfounded or medically inappropriate—they merely argue that he did not testify to the standard of care. (Doc. # 60 at 17). But since Davis produced other evidence of the standard of care and how Defendants breached the standard of care—i.e., Bernard's testimony that Bennett-Baker and Mabry breached the

standard of care owed—Dr. Brgoch did not have to establish the standard of care on his own. *See Rowland*, 2020 WL 4288401, at *6. As such, the Court finds there is an issue of material fact as to whether Bennett-Baker and Mabry caused Davis's injuries. Accordingly, Defendants' Motion for Summary Judgment on Davis's negligence claim must be **denied** as to Defendants Bennett-Baker and Mabry.[4]

However, the Court will grant Defendants' Motion as to Davis's gross negligence claim. Davis has not put forth any evidence that Defendants acted intentionally or with a known or obvious risk to Davis's health with their care. There's no evidence Defendants acted with a conscious indifference, which the Court addressed in depth *supra*. Accordingly, Defendants' Motion is **granted** as to Davis's gross negligence claim.

### D. *Monell* Claim

Finally, SHP moves for summary judgment on Davis's *Monell* claim. Title 42 U.S.C. § 1983 is the vehicle by which individuals may bring suits against government officials for violations of their rights under the Constitution and federal law. Specifically, § 1983 authorizes an individual to bring suit "against anyone who, under color state law, deprives a person of rights, privileges, or immunities secured by the Constitution or conferred by federal statute." *Wurzelbacher v. Jones-Kelly*, 675 F.3d 580, 583 (6th Cir. 2012). To state a claim under § 1983, a plaintiff must allege that (1) some person deprived her of a federal right; and (2) that the person depriving her of that right acted under color of state or territorial law. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). To establish a deprivation The Sixth Circuit recognizes that private actors may be subject to § 1983 claims "if their conduct qualifies them to be considered state actors" and their

---

[4] The Court will **grant** Defendants Ferguson and McGlone's Motion for Summary Judgment since Davis cannot establish either Defendant breached the duty of care they owed to him.

actions may be "fairly attributable to the state." *Nugent v. Spectrum Juv. Just. Servs.*, 72 F.4th 135, 139–40 (6th Cir. 2023).

In *Monell*, the Supreme Court held that plaintiffs may pursue § 1983 claims against municipal governments when they suffer constitutional injuries resulting from a municipality's established policies or procedures. *Monell*, 436 U.S. at 690–91. The same guidelines and analysis apply to private corporations acting under the color of state law. *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996). Thus, to bring his action against SHP, Davis must point to a policy or custom of SHP's that deprived him of a constitutional right. *Id*.

Here, the Court finds there is no *Monell* liability. The Court found *supra* that Davis did not suffer a deprivation of his rights under the Fourteenth Amendment. A failure to show a constitutional deprivation dooms a *Monell* claim. *See Chambers v. Sanders*, 63 F.4th 1092, 1101-02 (6th Cir. 2023) ("There can be no liability under *Monell* without an underlying constitutional violation."). Accordingly, Defendants' Motion is **granted** as to Davis's *Monell* claim.

## IV. CONCLUSION

Accordingly, **IT IS ORDERED** that:

(1) Defendants' Motion for Summary Judgment (Doc. # 60) is **GRANTED IN PART** and **DENIED IN PART**, being **granted** with respect to Count One, Count Two's negligence claim against Defendants Ferguson and McGlone and Count Two's gross negligence claim, and Count Three, and **denied** with respect to Count Two's negligence claim against Defendants Bennett-Baker, Mabry and SHP;

(2) The parties are **DIRECTED** to file a **Joint Status Report within thirty (30) days from the date of entry of this Order** indicating whether they would be amendable to pursuing mediation, either privately or court-facilitated, as to the remaining negligence claim.

(3) Upon receiving the Status Report referenced in paragraph (2) above, the Court will enter a follow-up pretrial Order addressing next steps in the case.

This 3rd day of September, 2026.

**Signed By:**
***David L. Bunning*** DB
**Chief United States District Judge**

G:Judge-DLB\DATA\ORDERS\Ashland Civil\2023\23-25 MOO re MSJ.docx